UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>          vs.<br><br>BUD THEUS III,<br><br>                              Defendant. | 4:16-CR-40065-KES<br><br><br>REPORT AND RECOMMENDATION |

## INTRODUCTION

Defendant Bud Theus III is before the court on an indictment charging him with being a felon in possession of firearms, in violation of 18 U.S.C. § 922(g)(1).  See Docket No. 1.  Mr. Theus has filed a motion to suppress certain evidence.  See Docket Nos. 27 & 30.  The United States ("government") resists this motion.  See Docket Nos. 29 & 31.  This matter has been referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and the October 16, 2014, standing order of the Honorable Karen E. Schreier, district judge.

## FACTS

An evidentiary hearing was held on December 14, 2016.  Mr. Theus was present in person along with his lawyer, Kenneth Tschetter.  The government was represented by its Special Assistant United States Attorney, Tamara Nash.

Two witnesses testified and one exhibit was received into evidence.  From this evidence, the court makes the following findings of fact.

On February 19, 2016, just before 11:30 p.m., Officer Chad Winkel of the Sioux Falls Police Department was on patrol, sitting approximately 70 feet east from the intersection of West 10th Street and South Western Avenue in Sioux Falls, South Dakota.  Officer Winkel's car was parked parallel to the northside curb on 10th Street with his vehicle facing west, immediately adjacent to the west-bound lane of travel on 10th street.  Officer Winkel was watching the intersection to see if anyone violated the flashing traffic signal there.  The climate controls for Officer Winkel's vehicle were located around the backside of his dash-mounted computer.  Because of this, Officer Winkel testified it is easier for him to simply roll the windows up and down in his patrol vehicle to control the temperature rather than operating the heat and air conditioning controls, which are located behind his computer mount.  At the time, Officer Winkel had both front windows cracked open despite the fact it was February on the northern plains.[1]

_____

[1] Weather records for February 19, 2016, in Sioux Falls, South Dakota, indicate the high temperature that day was 55 degrees Fahrenheit and the low temperature was 36 degrees.  See https://www.wunderground.com/history/airport/KFSD/2016/2/19/DailyHistory.html?req_city=&reg_statename=&req.  Last checked Dec. 19, 2016.  Wind speeds were negligible after approximately 6 p.m. that day.  Id.  This is the type of fact of which the court is allowed to take judicial notice.  See FED. R. EVID. 201(b).  If either party wishes to be heard as to the propriety of the court taking judicial notice of these easily-ascertainable facts, the parties should so notify the court and a hearing will be scheduled.  All three officers depicted in Exhibit 1 were in short-sleeved uniform shirts with no jackets or coats.  The defendant was wearing a light-weight jacket.

At 11:30:42 a dark Cadillac drove past Officer Winkel's patrol vehicle going west on West 10th Street.  The Cadillac passed within a few feet of the patrol car.  Officer Winkel testified he smelled the odor of burnt marijuana as the Cadillac passed by him.  Officer Winkel immediately took steps to follow the Cadillac, but a light-colored sport-utility vehicle (SUV) was following the Cadillac and Officer Winkel had to let the SUV pass before pulling into the westbound lane of travel on West 10th Street.  Once Officer Winkel began to follow the two vehicles, he positioned his patrol vehicle in the lane so as to keep the Cadillac in his sight despite the intervening presence of the SUV.  During this period of time, Officer Winkel could no longer smell marijuana.

Six blocks west of the original intersection, at 11:31:53 the Cadillac made a left turn heading south off of 10th Street and onto South Garfield Avenue.  The SUV continued west on West 10th Street.  Although Officer Winkel saw the Cadillac slow down to turn the corner, he never saw the Cadillac stop anywhere.  Officer Winkel turned south onto South Garfield Avenue, now following directly behind the Cadillac.  At this point, he could smell the odor of burnt marijuana again.  The Cadillac pulled into a parking lot of a Chinese restaurant at the corner of West 12th Street and South Garfield Avenue.  Officer Winkel pulled in behind the Cadillac, still able to smell the odor of burnt marijuana.  At this point, Officer Winkel activated his lights.  The time was 11:32:27.  Approximately two minutes had elapsed between Officer Winkel's first sighting of the Cadillac and the time he effectuated the traffic stop of the Cadillac.

Upon seeing the patrol lights, Mr. Theus immediately exited the driver's side of the Cadillac.  Officer Winkel testified that as Mr. Theus exited, Officer Winkel could observe smoke rolling out of the Cadillac from the passenger side of the car.  This smoke is not visible on Exhibit 1.  Officer Winkel, still in the process of calling in the license plates of the Cadillac to dispatch, ordered Mr. Theus to retake his seat in the Cadillac.  Mr. Theus complied.  Officer Winkel testified he did this for reasons of officer safety, stating that the most dangerous time for a patrol officer is immediately after a traffic stop has been effectuated and while the officer is still in his patrol car.

At 11:32:59 Officer Winkel exited his patrol car and approached Mr. Theus' Cadillac on the passenger side.  He testified he still smelled the odor of burnt marijuana.  He told Mr. Theus his car reeked of "weed" and so did he.  Mr. Theus stated a passenger had been smoking marijuana in his car and Mr. Theus "made him get out of my damn car."  He explained he had dropped the passenger off at some apartments a short distance back on 10th Street.

At 11:34:05 Officer Winkel told Mr. Theus to exit his car and come with the officer to the rear of the Cadillac.  Mr. Theus complied.  Officer Winkel noted the odor of burnt marijuana emanating from Mr. Theus' person as he did so.  Officer Winkel directed Mr. Theus to place his hands on the trunk of the Cadillac and Mr. Theus did so.

Mr. Theus asked Officer Winkel why he was pulled over.  Officer Winkel reiterated that Mr. Theus' car reeked of weed.  "But why did you pull me over?" Mr. Theus asked.  Officer Winkel explained that when Mr. Theus' car was

4

driving past him it stunk of weed.  At 11:34:15 Lieutenant Jon Lohr of the Sioux Falls Police Department arrived on the scene and took a position near Mr. Theus and Officer Winkel near the trunk of the Cadillac.  Officer Winkel advised Mr. Theus that his story about an alleged passenger bothered him because Officer Winkel had been following Mr. Theus since before the apartments and never saw Mr. Theus stop his Cadillac.

Officer Winkel asked Mr. Theus if he had anything in his pockets.  At 11:34:37 he began a pat-down search of Mr. Theus' body and clothing.  At 11:35:01 Officer Winkel found a baggie in Mr. Theus' pocket containing some marijuana.  He held it up for Mr. Theus and Lt. Lohr to see and commented that the baggie contained marijuana.  He asked Mr. Theus how it was that his passenger had the weed and was supposedly smoking it, but the weed was in Mr. Theus' pocket.

At 11:36:03 a third officer, Officer Vandervelde, arrived on the scene.  For a time, both he and Lt. Lohr stood watch over Mr. Theus while Officer Winkel began searching Mr. Theus' car.  Mr. Theus stood in a stationary position with his hands on the trunk of the Cadillac during this whole time.  The two guarding officers stood about an arm's length away from him.  Both Officer Winkel and Lt. Lohr testified the reason Mr. Theus was guarded during the traffic stop was two-fold:  (1) to prevent Mr. Theus from fleeing and (2) to make sure Mr. Theus did not attack and harm one of the officers.  Both Officer Winkel and Lt. Lohr testified that, after discovering the baggie of marijuana in

his pocket, Mr. Theus was not yet under formal arrest, but he would not have been allowed to leave the scene.

At 11:36:40 Lt. Lohr left Mr. Theus' side and began to assist Officer Winkel in the search of the Cadillac.  Officer Vandervelde stayed with Mr. Theus.  Lt. Lohr spoke to Officer Winkel, he smelled the odor of marijuana before he had even gotten out of his patrol car.  Lt. Lohr remarked that the smell must have been coming in through his vehicle's air vents.  Officer Winkel told Lt. Lohr he was sitting at the corner of 10th Street and Western Avenue and smelled the odor of marijuana when Mr. Theus' Cadillac drove by.  He said an SUV got in between him and Mr. Theus and he could not smell marijuana then.  Officer Winkel told Lt. Lohr that when Mr. Theus turned and Officer Winkel was once more right behind him, he smelled weed again, so he knew he had the right one.  In the interior of the Cadillac, officers found a burning marijuana cigarette in the center console in a cup ashtray, some rolling papers, and a grinder with fresh marijuana.

At 11:39:23 Lt. Lohr told Mr. Theus to move away from his trunk and stand in front of Officer Winkel's patrol car.  Mr. Theus complied.  Officer Vandervelde moved in tandem with Mr. Theus, always remaining approximately an arm's length away from him.  At this point, Mr. Theus no longer had his hands on a vehicle and did not stand in a stationary position—he is seen in the video alternately with his hands in his jacket pockets or gesturing and his feet shifting position here and there.

At 11:39:53 Lt. Lohr opened the trunk to the Cadillac and began searching there.  He discovered a handgun wrapped in a terrycloth towel.  He showed the gun to Mr. Theus and either made a comment or asked a question (the audio is not clear on Exhibit 1).  Lt. Lohr testified the reason for saying anything to Mr. Theus was to ascertain whether Mr. Theus legally possessed the gun.   Mr. Theus stated he owned a business in a bad neighborhood. Lt. Lohr did not hear the statement clearly and asked Mr. Theus to repeat his statement, which he did.  Lt. Lohr then asked Mr. Theus if the gun was his. Mr. Theus responded that the Cadillac was his, but never commented on ownership of the gun.

At 11:42:50 Officer Winkel handcuffed Mr. Theus.  At 11:43:27 he told Mr. Theus he was under arrest for possession of marijuana.  Mr. Theus was questioned as to whether he had a criminal record; Mr. Theus advised he did.

Mr. Theus originally moved to suppress the physical fruits of the search of his Cadillac and his person.  See Docket No. 27.  He then filed a supplement to his motion seeking to suppress his statements on the grounds that they were taken in violation of the rule in Miranda.[2]  See Docket No. 30.  At the conclusion of the evidentiary hearing in this matter, Mr. Theus conceded the search of his Cadillac was lawful and that the search of his person yielded no evidence which is relevant to the prosecution of this firearms offense. Accordingly, the two issues that remain are (1) whether the stop of Mr. Theus' vehicle was supported by reasonable suspicion and (2) whether his statements

[2] Miranda v. Arizona, 384 U.S. 436, 444 (1966).

were taken in violation of the rule in <u>Miranda</u>.  The government opposes both grounds for suppression.

## DISCUSSION

### A.   Was the Stop of Mr. Theus' Vehicle Justified?

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures.  When a law enforcement officer stops a motor vehicle and questions its occupants, the stop constitutes a seizure under the Fourth Amendment, "even though the purpose of the stop is limited and the resulting detention quite brief."  <u>Brendlin v. California</u>, 551 U.S. 249, 255-56 (2007); <u>Delaware v. Prouse</u>, 440 U.S. 648, 653 (1979); <u>United States v. Wheat</u>, 278 F.3d 722, 726 (8th Cir. 2001).  A stop results in a seizure under the Fourth Amendment of all occupants of the vehicle, driver and passengers. <u>Brendlin</u>, 551 U.S. at 255-56.  A traffic stop may be lawfully made under two circumstances.  If there is probable cause to stop the vehicle, such a stop is lawful.  <u>United States v. Sallis</u>, 507 F.3d 646, 649 (8th Cir. 2007) (quoting <u>Untied States v. Coney</u>, 456 F.3d 850, 855-856 (8th Cir. 2006) (quoting <u>United States v. Linkous</u>, 285 F.3d 716, 719 (8th Cir. 2002))).  Also, if there is reasonable suspicion to stop the vehicle, the stop complies with the Fourth Amendment.  <u>Ornelas v. United States</u>, 517 U.S. 690, 693 (1996); <u>United States v. Spotts</u>, 275 F.3d 714, 718 (8th Cir. 2002); <u>United States v. Bell</u>, 183 F.3d 746, 749 (8th Cir. 1999).

Probable cause exists where the totality of the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has

committed a crime.  There need only be a probability or substantial chance of criminal activity, rather than an actual showing of criminal activity.  United States v. Torres-Lona, 491 F.3d 750, 755-756 (8th Cir. 2007).  There must be evidence which would "warrant a man of reasonable caution in the belief" that a crime has been committed.  Wong Sun v. United States, 371 U.S. 471, 479 (1963).

An officer making a Terry[3] stop based upon "reasonable suspicion," "must be able to articulate something more than an 'incohate and unparticularized suspicion or "hunch." ' " United States v. Sokolow, 490 U.S. 1, 7 (1989).  The Fourth Amendment requires "some minimal level of objective justification" for making the stop.  INS v. Delgado, 466 U.S. 210, 217 (1984). The Court has held that probable cause means " 'a fair probability that contraband or evidence of a crime will be found,' and the level of suspicion required for a Terry stop is obviously less demanding than for probable cause." Sokolow, 490 U.S. at 7 (citing Illinois v. Gates, 462 U.S. 213, 238 (1983)). "Police must have a 'particularized and objective basis' for suspecting criminal activity at the time the stop is made."  Spotts, 275 F.3d at 718.

"Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable

---

[3] Terry v. Ohio, 392 U.S. 1 (1968).

cause." <u>Alabama v. White</u>, 496 U.S. 325, 330 (1990).  "Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability.  Both factors–quantity and quality–are considered in the 'totality of the circumstances–the whole picture,' that must be taken into account when evaluating whether there is reasonable suspicion."  <u>Id.</u> at 330 (quoting <u>United States v. Cortez</u>, 449 U.S. 411, 417 (1981)).

"[T]he constitutional reasonableness of a traffic stop does not depend on the actual motivations of the officer involved, and the subjective intentions of the officer making the stop are irrelevant in determining the validity of the stop." <u>United States v. Herrera-Gonzales</u>, 474 F.3d 1105, 1109 (8th Cir. 2007). <u>See also</u> <u>United States v. Andrews</u>, 465 F.3d 346, 347 (8th Cir. 2006) (*per curiam*) ("[T]he fourth amendment is not violated if an objectively good reason for a traffic stop exists, whatever the actual subjective motive of the officer making the stop may have been.").  Although a traffic violation can provide the basis for a <u>Terry</u> stop, there is no requirement that a traffic violation occur if there are other grounds providing the officer with a reasonable, articulable suspicion of criminal activity.  <u>United States v. Jacobsen</u>, 391 F.3d 904, 907 (8th Cir. 2004) (quoting <u>United States v. Mora-Higuera</u>, 269 F.3d 905, 909 (8th Cir. 2001)).

Here, the court admits to frank skepticism initially about Officer Winkel's claim to have smelled the odor of burnt marijuana coming from Mr. Theus' Cadillac as that vehicle passed Officer Winkel's parked patrol vehicle on 10th

Street.  However, Mr. Theus introduced no evidence at the hearing to shake Officer Winkel's testimony.  Moreover, Officer Winkel's initial observation was corroborated in two ways.  First, Officer Winkel himself testified that, while traveling behind the Cadillac with the SUV between his patrol car and the Cadillac, he could not smell marijuana, but that once both he and Mr. Theus turned south onto Garfield Avenue and Officer Winkel was once again directly adjacent to Mr. Theus' Cadillac, the smell resumed.  Second, Lt. Lohr testified that, upon his arrival on the scene, the smell of burnt marijuana invaded his closed patrol vehicle through the vents before he ever opened his door. Additionally, though it is post hoc evidence, it does nevertheless bolster Officer Winkel's testimony that an actual, burning marijuana cigarette was located in the center ashtray of Mr. Theus' car, even after Theus had been pulled over, had exited his vehicle once and then got back inside again, and then exited a second time.  An actual live burning marijuana cigarette would tend to emit a stronger odor of burnt marijuana than simply the smell that might linger afterward once the cigarette was consumed.

Possession and ingestion of marijuana are criminal violations under South Dakota law.  The court concludes, given the totality of evidence available to Officer Winkel before he activated his lights and effected a stop of Mr. Theus, there was a reasonable suspicion that criminal activity was afoot.  Accordingly, the court concludes that the traffic stop of Mr. Theus was lawful under the Fourth Amendment.  Mr. Theus' motion to suppress on the grounds that his initial stop violated the Fourth Amendment should be denied.

11

**B.**   **Are Mr. Theus' Statements Admissible?**

Mr. Theus moves to suppress his statements made at the traffic stop as he asserts they were the product of custodial interrogation.  The holding of the Miranda case "is that an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning." United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)).  A Miranda warning is required prior to questioning whenever two conditions are present:  (1) the suspect is being interrogated and (2) the suspect is in custody.  Unites States v. Flores-Sandoval, 474 F.3d 1142, 1146 (8th Cir. 2007); Griffin, 922 F.2d at 1347; United States v. Carter, 884 F.2d 368, 371 (8th Cir. 1989).

Interrogation includes direct questioning or any practice reasonably likely to evoke an incriminating response from a suspect.  See Rhode Island v. Innis, 446 U.S. 291, 301 (1980).  Here, neither party disputes that Mr. Theus was being interrogated and neither party disputes that Miranda warnings were not given prior to the questioning in this case.  Thus, whether Mr. Theus' statements should be suppressed pursuant to the rule in the Miranda case depends on whether Mr. Theus was in custody at the time of his interrogation.

Some courts have placed the burden of proving that the defendant was not in custody at the time of the interrogation on the government.  See United States v. Charbonneau, 979 F. Supp. 1177 (S.D. Ohio 1997).  Other courts have placed the initial burden on the defendant to prove that he was "in

12

custody," with the burden of proof shifting to the government to prove a voluntary waiver only after the defendant has sustained his initial burden.  See United States v. Moore, 104 F.3d 377, 391 (D.C. Cir. 1997).  The Eighth Circuit appears not to have addressed this issue yet, although some district courts within the circuit have.  See e.g. United States v. Morriss, 2006 WL 3519344 (W.D. Mo. 2006) (placing initial burden on defendant and citing to extra-circuit cases for authority).  For purposes of this report and recommendation, the court has placed the burden of proving that Mr. Theus' statements were *not* the subject of custodial interrogation on the government.

The Supreme Court in Berkemer v. McCarty, 468 U.S. 420 (1984) addressed the issue of whether a motorist who is the subject of a traffic stop is "in custody" for purposes of Miranda.  After the motorist is formally arrested on a traffic violation, no matter how minor, the Court held that Miranda warnings are required.  Berkemer, 468 U.S. at 434-435.  However, during the traffic stop itself and prior to arrest, the Court held that Miranda applies only when and if the "suspect's freedom of action is curtailed to a 'degree associated with formal arrest.' " Id. at 440-441 (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (*per curiam*)).

The Court acknowledged that a traffic stop "significantly curtails the 'freedom of action' of the driver and the passengers" in the detained vehicle, noting that drivers who see a policeman's signal neither feel free to ignore that signal nor to drive away, once stopped.  Id. at 436.  However, a traffic stop is generally devoid of those elements of coercion that prompted the

announcement of the rule in <u>Miranda</u>.  <u>Id.</u> at 436-438.  For example, the detention is presumptively temporary and brief, with the driver being allowed to continue on his way after a check of his license and registration and, perhaps, the issuance of a citation.  <u>Id.</u> at 437.  Also, the interrogation takes place in public, subject to observation by pedestrians and other vehicles, thus reducing the ability of an unscrupulous policeman to "use illegitimate means to elicit self-incriminating statements and diminish[ing] the motorist's fear that, if he does not cooperate, he will be subjected to abuse."  <u>Id.</u> at 438.  Thus, the Court concluded that the "noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for purposes of Miranda."  <u>Id.</u> at 440.

The <u>Berkemer</u> Court directed courts to consider factors such as the following in determining whether a suspect at a traffic stop was "in custody" such that <u>Miranda</u> warnings were required:  period of time elapsed between the traffic stop and the arrest, whether the suspect was informed his detention was only temporary or that he was not under arrest, and the character and nature of the interaction between the police and the suspect at the stop.  <u>Id.</u> at 441-42.

The test of whether a suspect is "in custody" is one of objective reasonableness judged from the point of view of the suspect, not from the point of view of the interrogator.  <u>Berkemer</u>, 468 U.S. at 442; <u>United States v. Black Bear</u>, 422 F.3d 658, 661 (8th Cir. 2005); <u>United States v. Griffin</u>, 922 F.2d 1343, 1347 (8th Cir. 1990); <u>United States v. Carter</u>, 884 F.2d 368, 370 (8th

Cir. 1989).  In determining whether a suspect reasonably believed himself or herself to be in custody, the court examines the totality of the circumstances. Carter, 884 F.2d at 370 (citing United States v. Lanier, 838 F.2d 281, 285 (8th Cir. 1988) (per curiam)).

Under the totality of the circumstances test, six nonexclusive factors have emerged with some frequency:  (1) whether the suspect was informed that he was free to leave and that answering the interrogator's questions was voluntary; (2) whether the suspect possessed freedom of movement during the interrogation; (3) whether the suspect initiated contact with the interrogator or voluntarily acquiesced in the interrogation; (4) whether the interrogator employed strong-arm tactics or strategies; (5) whether the atmosphere of the interrogation was dominated by the police; and (6) whether the suspect was arrested at the close of the interrogation.  See United States v. Flores-Sandoval, 474 F.3d 1142, 1146-1147 (8th Cir. 2007) (citing Griffin, 922 F.2d at 1349). Reference to these factors is helpful, but these factors are not exclusive and custody "cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly."  Flores-Sandoval, 474 F.3d at 1147.  In addition, the place where the interrogation took place, the purpose of the interrogation, the length of the interrogation, and other factors are also to be considered.  Griffin, 922 F.2d at 1348; Carter, 884 F.2d at 370.

In United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004), the Eighth Circuit cautioned the Griffin factors are by no means exhaustive and

should not be applied "ritualistically."  The Court emphasized "an express advisement that the suspect is not under arrest and that his participation is voluntary" is the most obvious and effective means of demonstrating he has not been taken into custody.  Id. at 826.  The Eighth Circuit regards the twin admonitions that the suspect is free to leave and does not have to answer questions to be "weighty in the custody analysis."  United States v. Perrin, 659 F.3d 718, 720-21 (8th Cir. 2011).  The Griffin factors still appear in Eighth Circuit case law after Czichray, and continue to be cited with approval for determining the custody issue.  See id.

The Eighth Circuit discussed the application of Berkemer to a traffic stop in United States v. Morse, 569 F.3d 882 (8th Cir. 2009).  In that case, police stopped the vehicle in which Morse was a passenger.  Id. at 883.  The driver was arrested for driving with a suspended license and the officer asked Morse to exit the vehicle so as to conduct a search of the vehicle incident to arrest. Id.  When Morse exited, the officer told Morse he was going to conduct a pat-down search and asked Morse if he had anything on his person the officer should know about.  Id.  At that point, Morse told the officer he had crack cocaine in his pocket.  Id.  Morse later moved to suppress his statement and the fruits of the officer's search of his person because the interrogation by the officer was without benefit of Miranda warnings.  Id.

The district court granted the motion to suppress, declining to apply the holding of Berkemer because the district court held that "the questioning of [Morse] was not in connection to the reason for the stop and far exceeded a

16

routine roadside questioning." Id. at 884.  The Eighth Circuit reversed, holding that Berkemer controlled the analysis.  Id. at 884-85.  The court held that, under Berkemer, the mere fact that Morse did not feel free to leave was not determinative of whether Miranda warnings were required.  Id.  In addition, the court noted that Morse was asked only a "modest number of questions" and the facts did not establish a situation tantamount to a formal arrest.  Id.

In United States v. Rodriguez, 711 F.3d 928, 935 (8th Cir. 2013), the court also found the defendant was not in custody during questioning at a traffic stop.  The facts in that case were the defendant was stopped after police observed his vehicle had no license plates and the registration had expired.  Id. at 933.  As the police officer approached Rodriguez's car, he saw a television and speakers in the back seat.  Id.  Rodriguez told the officer his driver's license was suspended, but gave him his date of birth.  Id.  The vehicle was not registered either to Rodriguez or his passenger.  Id.  The officer returned to his patrol car to run a records search, leaving the two men in Rodriguez's car.  Id. While seated in his patrol car, the officer saw Rodriguez and the passenger reaching for the floorboard and looking back at the officer.  Id.  The records check revealed the car was registered to a third party and there was a possible felony arrest warrant outstanding for Rodriguez.  Id.

Fearing for his safety, the officer called for backup.  Id.  When assistance arrived, the officers ordered Rodriguez out of his car.  Id.  The officer asked Rodriguez what he had been reaching for and Rodriguez told the officer there was a handgun in the center console.  Id.  The officer then handcuffed

Rodriguez for officer safety, but told Rodriguez he was *not* under arrest.  Id.
The officer then put Rodriguez into his patrol car.  Id.  The officer asked
Rodriguez if there was any other contraband in his car, and Rodriguez
admitted there was a methamphetamine pipe under the driver's seat.  Id.  The
second officer similarly handcuffed the passenger and placed the passenger
into a separate patrol car.  Id.

On appeal, Rodriguez argued he was "in custody" for purposes of
Miranda as soon as the officer ordered him to exit his vehicle.  Id. at 935.  The
issue of whether Rodriguez was "in custody" when he was handcuffed and
seated in the back of the officer's patrol vehicle was not raised, briefed or
argued on appeal.  Id. at 935 n.2.  As to the issue of whether Rodriguez was "in
custody" at the moment he was ordered to exit his car, the court held he was
not.  Id. at 935.  At that moment, the officer had legitimate concerns for his
own safety because of the reach for the floorboards, the nature of the car was
suspicious (no license plates and registered to a third party with different last
name than either Rodriguez or his passenger), and there was a possible felony
warrant for Rodriguez, from whom the officer had not received any form of
identification.  Id.  Under these circumstances, the court held the officer was
justified under Berkemer and Terry in removing Rodriguez from the car and
securing him while the officer investigated further.  Id.

Here, both Officer Winkel and Lt. Lohr testified that Mr. Theus was no
longer free to leave once the baggie with marijuana residue was found in his
pocket.  To that end, from this point on in the traffic stop, Mr. Theus was

18

constantly under the guard of either Lt. Lohr or Officer Vandervelde or both to (1) make sure Mr. Theus did not flee and (2) ensure officer safety.  Mr. Theus was not formally arrested until later and he was not handcuffed or physically bound until later.  But the inquiry is totality of the circumstances.  The discovery of the baggie in Mr. Theus' pocket was "the sound of the spear hitting bone" in terms of his liberty interest and all who were present at the traffic stop knew this.

Other factors support this conclusion.  Mr. Theus was alone in a vacant parking lot, late at night, with three armed uniformed police officers.  Officer Winkel's questions and statements made to Mr. Theus do not amount to strong-arm tactics, but they were definitely accusatory.  Furthermore, once the baggie was found, a fact made known to Mr. Theus, he was under constant guard by at least one of the three officers at all times.  His movements were controlled:  he was told where to stand, what to do with his hands, and where to move.  The officers testified that once the baggie was discovered, Mr. Theus would not have been allowed to leave.  Clearly, the officers' belief that Mr. Theus was not free to go was communicated to Mr. Theus through their control of his movements.  Furthermore, an ordinary reasonable person in Mr. Theus' circumstances would understand that the discovery of the baggie removed this traffic stop from that category of routine stops described in Berkemer wherein the motorist is not free to leave, but knows that his or her detention will be brief.  Here, once the baggie was found, Mr. Theus knew his detention would eventually turn into an arrest.  In fact, he was arrested at the

19

end of the search, another factor favoring a finding that Mr. Theus was in custody.

At no time during the sequence of events on the night of February 19 did any of the three officers tell Mr. Theus explicitly "you are not under arrest," or "we are keeping you only temporarily." As the Eighth Circuit has said, if police want a suspect to know he is not under arrest, the most obvious and effective method is to tell him that. Czichray, 378 F.3d at 826. The officers did not tell Mr. Theus he was not under arrest or that he was not going to be arrested. That is because they all knew he would be arrested once the baggie was found.

The government emphasizes the brief period of time which elapsed between the initiation of the traffic stop and Mr. Theus' formal arrest, a period of approximately 10 minutes. This factor does weigh in favor of a finding that Mr. Theus was not in custody. However, the Eighth Circuit cautions trial courts not to simply engage in a "counting" of the Griffin factors, but to look at the overall circumstances and give appropriate weight to those circumstances. Because of the obvious implications which came from the discovery of the baggie in Mr. Theus' pocket, that fact outweighs how little time elapsed. If a bank robber were stopped by police on a sidewalk right outside the scene of his crime with an incriminating bag of cash and a cartoon mask in his hand, it would not matter how brief the police questioned him—his being caught under those circumstances would clearly communicate to him that "the jig was up" and his formal arrest was a foregone conclusion. So, too, here.

20

It is undisputed that no <u>Miranda</u> warnings were given by any of the three police officers to Mr. Theus at any time during the traffic stop on the night of February 19.  Therefore, the court recommends that all of Mr. Theus' statements at the traffic stop from the time the baggie was found on his person (11:35:01 pm on Exhibit 1), forward be suppressed.

**C.    Inevitable Discovery**

The government argues that Mr. Theus' statement that he had a prior felony conviction is subject to the inevitable discovery doctrine and, thus, should not be suppressed.  For the inevitable discovery doctrine to apply, there must be a reasonable probability the police would have discovered the evidence in the absence of police misconduct while the police were pursuing an alternative, substantial line of investigation.  <u>United States v. Alvarez-Gonzalez</u>, 319 F.3d 1070, 1072 (8th Cir. 2003).  Proof of inevitable discovery of illegally seized evidence must be shown by the government to have been more likely than not.  <u>Nix v. Williams</u>, 467 U.S. 431, 444, n.5 (1984).

Here, government counsel agreed at oral argument following the hearing that police would inevitably have discovered the fact of Mr. Theus' prior felony conviction while booking him into the jail on his arrest for possession of marijuana.  However, counsel conceded that such discovery would have been as to Mr. Theus' status, not discovery of his statement—i.e. his *admission* of his prior conviction.  The court holds that the police would have inevitably have discovered Mr. Theus' prior conviction.  Proof of that fact can be adduced by the government at Mr. Theus' trial in the form of properly authenticated

documents or whatever other avenue the government wishes to prove that fact. However, Mr. Theus' *statement* to Lt. Lohr that he had a felony conviction would not have been inevitably discovered.  The court holds that statement must be suppressed at trial.

### D.    Physical Evidence

The court's recommendation to suppress statements pursuant to Miranda applies only to Mr. Theus' statements to police after the baggie was found on his person.  It does not apply to statements made prior to discovery of the baggie.  Prior to the discovery, the traffic stop was governed by the typical rule described in Berkemer.  The court's suppression recommendation also does not apply to the baggie or to any of the physical items discovered in Mr. Theus' Cadillac.

In United States v. Patane, 542 U.S. 630, 633-634 (2004), the Court addressed whether physical evidence obtained as a result of a voluntary but unwarned statement should be suppressed as fruit of the poisonous tree because the statement was obtained in violation of Miranda.  Justices Thomas and Scalia and then-Chief Justice Rehnquist held that physical evidence does not fall within the Fifth Amendment's protection against self-incriminating statements and, therefore, physical evidence which is obtained pursuant to voluntary but unwarned statements need not be suppressed.  Id. (plurality). Justices Kennedy and O'Connor concurred, stating that admission of physical evidence does not "run the risk of admitting into trial an accused's coerced incriminating statements against himself."  Id. at 645.

22

The Eighth Circuit has addressed the issue of the admissibility of physical evidence in the form of a suspect's fingerprints that were obtained through unwarned, voluntary statements.  See United States v. Flores-Sandoval, 474 F.3d 1142, 1144 (8th Cir. 2007).  The court held that so long as the non-Mirandized statement was voluntary, the Miranda violation does not warrant the suppression of derivative physical evidence.  Flores-Sandoval, 474 F.3d at 1147.

In United States v. Phillips, 468 F.3d 1264 (10th Cir. 2006), the Tenth Circuit held that DNA evidence obtained from a defendant without prior Miranda warnings need not be suppressed.  Phillips, 468 F.3d at 1265-1266. In Phillips, the police had obtained an unwarned statement from Phillips and used that statement in an affidavit seeking a search warrant for the purpose of obtaining a buccal swab from Phillips.  Id.  Phillips argued that the buccal swab evidence and the resulting DNA analysis conducted from that buccal swab should be suppressed because the search warrant was based in part on a statement obtained in violation of Miranda.  Id.  Because the statement itself--though unwarned--was voluntary, the Tenth Circuit held that the resulting physical evidence need not be suppressed.  Id.  (citing United States v. Patane, 542 U.S. 630, 635, 645 (plurality opinion and Kennedy, J., concurring).  The Tenth Circuit also held that the fact that Patane had involved an unwarned statement that led to the physical evidence, while this case involved an unwarned statement that was used in an affidavit for a search warrant that in turn led to the physical evidence, was a distinction without any legal

23

significance.  Id.  Rather, the key fact was that the subject of the defendant's suppression motion in both cases was physical evidence rather than a statement.  See also United States v. Syslo, 303 F.3d 860 (8th Cir. 2002) (Miranda warning not required before handwriting exemplars are obtained from suspect).

In the Morse case discussed earlier, the court held that the drugs discovered in Morse's pocket at the traffic stop should not be suppressed if there was a Miranda violation.[4]  Morse, 569 F.3d at 884.  In United States v. Villa-Gonzalez, 623 F.3d 526, 535 (8th Cir. 2010), the court refused to apply Patane to physical fruits of a search and instead applied the fruit-of-the-poisonous-tree doctrine.  The difference between Morse and Villa-Gonzalez was that in the latter, there was both a Fourth Amendment violation as well as a Miranda violation, while in the former, there was no Fourth Amendment violation.  Compare Villa-Gonzalez, 623 F.3d at 534-35, with Morse, 569 F.3d at 884-85.

In Mr. Theus' case, the court has concluded there was no Fourth Amendment violation.  Furthermore, Mr. Theus does not argue that his statements were involuntary, only that they were unwarned.  See Docket No. 30 at pp. 3-9.  The only violation of constitutional dimension, then, was based on Mr. Theus' Fifth Amendment Miranda rights.  Accordingly, the rationale of Patane and Morse control.  That line of cases dictate that the physical fruits of the search of Mr. Theus' vehicle not be suppressed.

[4] This was dicta as the Morse court held no Miranda violation occurred, as discussed earlier.  Morse, 569 F.3d at 884-85.

## CONCLUSION

Based on the foregoing facts, law and analysis, this magistrate judge respectfully recommends that defendant Bud Theus III's motion to suppress [Docket Nos. 27 & 30] be granted in part and denied in part as follows:

1.    denied as to the physical fruits of the search of Mr. Theus' car and person; and

2.    denied as to statements made by Mr. Theus prior to Officer Winkel's discovery of the baggie in his pocket (occurring at 11:35:01 pm on Exhibit 1); and

3.    granted as to all statements made by Mr. Theus after the discovery of the baggie in his pocket.

## NOTICE TO THE PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED December 21, 2016.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge